# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO.  08-03381 |
| | : | |
| ROCKY MOUNTAIN HOLDINGS, INC., | : | |
| DIMELING, SCHREIBER & PARK, L.P., | : | |
| DIMELING, SCHREIBER & PARK | : | |
| REORGANIZATION FUND, L.P., | : | |
| | : | |
| and | : | |
| | : | |
| DUPONT CONOCO PRIVATE MARKET | : | |
| GROUP TRUST, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER, S. J.                                                        March 10, 2011

Presently before the Court are (1) the Motion for Summary Judgment by Plaintiff the United States of America; (2) Defendant Dupont Conoco Private Market Group Trust's ("Dupont") Motion for Summary Judgment; (3) Plaintiff's Objection to and Motion to Strike Exhibit 3 of Dupont's Reply in Opposition to Plaintiff's Motion for Summary Judgment; and (4) Defendant's Cross-Motion to Disregard and/or Strike.  For the following reasons, all Motions are denied.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

At issue in this action is whether Plaintiff United States can recover, pursuant to Pennsylvania's Uniform Fraudulent Transfer Act, more than $3 million in federal tax liability

owed by Rocky Mountain Holdings, Inc. ("RMH") from Defendant Dupont, as subsequent

transferee of an allegedly fraudulent conveyance.[1]  Defendant Dupont, a pension trust fund

located in Delaware, holds and manages pension fund assets for the benefit of employees of E.I.

du Pont de Nemours & Co. and Conoco, Inc.  (Def.'s Mot. Summ. J., Ex. 5, Dep. of Holly

Lissner, 108:2-108:4, 171:18-172:9, Mar. 24, 2010 ("Lissner Dep.").)  At the time of the

transfers in question, Dupont held an 88.99% limited partnership interest in a Delaware limited

partnership known as the Dimeling, Schreiber & Park Reorganization Fund, L.P. ("the Fund").

(Pl.'s Mot. Summ. J., Ex. 201; Def.'s Mot. Summ. J., Ex. 7.)  An entity known as Dimeling,

Schreiber & Park, L.P. ("DS&P") held the other 10.01% of the Fund as a limited partner, and

also held a 1% interest in the Fund as a general partner.  (Id.)  According to the facts on record,

the Fund's purpose was, in part, to create wholly-owned subsidiaries to indirectly invest in and

dispose of assets of companies that were making major changes to their capital structure.  (Def.'s

Mot. Summ. J., Ex. 3 § 1.2; Pl.'s Mot. Summ. J., Ex. 224.)  Between March 1994 and October

2004, Defendant made nearly $57 million in capital contributions to the Fund in its capacity as

limited partner.  (Def.'s Mot. Summ. J., Ex. 9.)

On August 30, 1994, the Fund formed RMH, a Delaware corporation, for the sole

purpose of acquiring an air medical transport business known as Rocky Mountain Helicopter,

Inc. ("Target Entity").  (Id. Ex. 1, Ex. 14.)  RMH was to act as a "blocker" corporation to protect

---

[1]  The statement of facts is compiled from a review of the parties' briefs and the evidence
submitted in conjunction with those briefs.  To the extent the parties allege a fact that is
unsupported by the evidence, the Court does not include it in the recitation of facts.  To the
extent a factual statement by a party is disputed by the other party, the Court will either take note
of the evidentiary conflict or make a factual finding that the evidence supports only one party's
version.  The Court will not, despite the parties' insistence, make credibility findings.

Dupont from unrelated taxable business income.  (Id.)  Due to the large size of the acquisition, the Fund brought in American Manufacturing Corporation, Inc. ("AMC"), a Delaware corporation, to finance 50% of the equity required to fund the acquisition.  (Id. Ex. 14.)  For tax purposes, RMH and AMC created Rocky Mountain Holdings, LLC ("RMH LLC"), a Delaware flow-through limited liability company, to acquire the Target Entity.  (Id. Exs. 18, 19.)

On October 16, 2002 in Philadelphia, Pennsylvania, RMH and AMC sold their membership interest in the target company for $28 million, subject to post-closing adjustments. (Id. Ex. 14.)  As a result of the sale, RMH received $15,157,403 in proceeds, representing 50% of the adjusted purchase price.  (Id. Ex. 12; Pl.'s Mot. Summ. J., Decl. of Richard Schreiber ¶ 5, Apr. 29, 2010 ("Schreiber Decl.").)  On October 17, 2002, RMH transferred $14,860,895 of these proceeds to the Fund, RMH's only shareholder.  (Def.'s Mot. Summ. J., Ex. 14; Schreiber Decl. ¶¶ 3, 6.)  That same day, the Fund wired 88.9% of the $14,860,895 (or $13,224,710.46) to the State Street Bank and Trust Company as Trustee of Defendant, and 11.01% (or $1,636,184.50) to DS&P.  (Def.'s Mot. Summ. J., Ex. 14; Schreiber Decl. ¶ 6.)  Later that day, DS&P transferred its $1,636,184.50 to Defendant in partial repayment of a loan, which was secured by DS&P's interest in the Fund.  (Id.)

On November 21, 2002, RMH received and immediately transferred to the Fund additional proceeds in the amount of $296,508.  (Schreiber Decl. ¶ 7.)  As before, the Fund transferred 88.99% of that amount (or $263,863) to the State Street Bank and Trust Company as Trustee of Defendant, and 11.01% (or $32,646) to DS&P.  (Id.)  DS&P then wired its share to Defendant.  (Id.)  In total, RMH transferred approximately $15,157,403 from the proceeds of the October 17, 2002 sale, all of which ended up in Defendant's account.  (Id. ¶ 8; Def.'s Mot.

Summ J., Stmnt. Facts ¶ 36.)  Since the transfer, the Fund and DS&P have wound down their businesses.  (Lissner Dep. 129:8-11; Def.'s Mot. Summ. J., Ex. 8, Dep. of Carmen J. Gigliotti, 102:23-103:5, Mar. 24, 2010 ("Gigliotti Dep.").)

Prior to the sale, RMH mistakenly believed it would incur no taxable gain on the transaction.  (Def.'s Mot. Summ. J., Ex. 14; Schreiber Dec. ¶ 10.)  Contrary to this belief, the sale in fact generated over $1.8 million in federal tax liability, plus state tax liability.  (Pl.'s Mot. Summ. J., Exs. 249, 250; Def.'s Mot. Summ. J., Ex. 16.)  Because RMH had sold its only asset and subsequently wound down its business, it did not have assets sufficient to pay its tax liability.  (Def.'s Mot. Summ. J., Ex. 26.)  In September 2003, RMH filed its federal income tax return for 2002, showing $1,813,601 of taxes due and unpaid.  (Id. Ex. 16; Pl.'s Mot. Summ. J., Exs. 249, 250.)

On November 10, 2003, a delegate of the Secretary of the Treasury of the United States issued corporate income tax, interest, and penalty assessments against RMH for the year 2002, based on the corporation's Form 1120 return, in the amount of $1,813,601.  (Def.'s Mot. Summ. J., Ex. 31.)  As a result of Rocky Mountain's failure to pay these assessments after due notice and demand, federal tax liens arose as of the date of each assessment in favor of the United States and against all property and rights belonging to RMH and the Fund.  (Id.; Am. Compl. ¶ 12.)  In addition, statutory penalties and interest were assessed against RMH.  (Pl.'s Mot. Summ. J., Ex 375; Am. Compl. ¶ 13.)  To date, Plaintiff has recovered only $15,972.27 of the assessed tax liability.  (Def.'s Mot. Summ. J., Ex. 31.)

On July 18, 2008, Plaintiff initiated the current litigation against RMH, the Fund, DS&P, and Defendant Dupont seeking to (1) reduce its tax assessment against RMH to judgment (Count

I), and (2) set aside the alleged fraudulent transfers by and among the Fund, DS&P, and DuPont (Count II).  On December 12, 2008, Dupont, DS&P, and the Fund moved to dismiss the fraudulent transfer claim.  The Court denied the motion on March 3, 2009.  By order entered on March 25, 2010, RMH consented to judgment against it "for unpaid income taxes and statutory additions to tax for the year 2002 in the amount of $3,237,969 as of July 21, 2008, plus statutory additions to tax according to law until fully paid."  (Docket No. 44.)  The Fund and DS&P consented to judgment for the same amount as fraudulent transferees under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 PA. CONS. STAT. § 5101 *et seq*.  (Id.)  These three Defendants were then dismissed from the case.  (Id.)  Plaintiff now seeks to collect the full amount of the judgment from Dupont, the only remaining Defendant, as subsequent transferee of a constructively fraudulent conveyance under PUFTA.

After the remaining parties engaged in discovery, both filed Motions for Summary Judgment on June 30, 2010.  The parties filed their respective Responses in Opposition to the opposing party's Motion on July 23, 2010.  On August 25, 2010, each party filed a Reply in Support of their respective Motions.  Plaintiff filed a Motion to Strike and an Objection to Exhibit 3 of Defendant's Reply Brief on September 7, 2010.  On September 21, 2010, Defendant filed a Cross-motion to Strike and a Response to Plaintiff's Motion to Strike.  Plaintiff filed a Response in Opposition to Defendant's Cross-motion to Strike on October 5, 2010.  The Court now considers these Motions.

## II.   STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts."

Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the nonmovant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Anderson, 477 U.S. at 249-50.

Notably, "[t]he rule is no different where there are cross-motions for summary judgment." Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008). As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III. CHOICE OF LAW

As an initial matter, the parties disagree over whether the Court should apply Pennsylvania or Delaware law. Federal courts sitting in Pennsylvania apply Pennsylvania law absent a true conflict of law. Van Doren v. Coe Press Equip. Corp., 592 F. Supp. 776, 782 (E.D. Pa. 2008). Both Pennsylvania and Delaware have adopted the same relevant language of the Uniform Fraudulent Transfer Act. See 12 PA. CONS. STAT. § 5101 et seq. ("PUFTA") and 6

DEL. CODE ANN. § 1301 *et seq.* ("DUFTA"). Defendant argues, however, that there is a "crucial

divergence" between the laws of the two states because DUFTA, unlike PUFTA, yields to

protections for limited partners afforded by the Delaware Revised Uniform Limited Partnership

Act ("DRULPA").

The Court comes to no such conclusion. First, Defendant cites no statutory text

indicating any relevant difference between the degree of protection afforded to limited partners

by the two states. The DRULPA provision Defendant cites merely states the general proposition

that limited partners are insulated from the obligations of a limited partnership. In fact, this

provision essentially mirrors that of Pennsylvania's Revised Uniform Limited Partnership Act

("RULPA").[2]

Next, Defendant offers no persuasive evidence that the legislative purpose or public

policy of the two states differ with respect to the liability of limited partners in fraudulent transfer

actions. Again, the judicial commentary Defendant cites merely restates the basic premise of

limited partnership liability – that limited partners are generally not liable for partnership

obligations. (Def.'s Reply Supp. Mot. Summ. J. 15.) While it is true that only Pennsylvania

---

[2] Compare 6 DEL. CODE ANN. § 17-303(a):

A limited partner is not liable for the obligations of a limited partnership unless he or she
is also a general partner or, in addition to the exercise of the rights and powers of a
limited partner, he or she participates in the control of the business.

with 15 PA. CONS. STAT. § 8523:

A limited partner is not liable, solely by reason of being a limited partner, under an order
of a court or in any other manner, for a debt, obligation or liability of the limited
partnership of any kind or for the acts of any partner, agent or employee of the limited
partnership.

offers legislative commentary explicitly stating that limited partnership distributions are subject to PUFTA, Defendant points to no DUFTA or DRULPA commentary expressing a contrary intent. Moreover, Defendant's argument that "the Delaware legislature has always been willing to expand DRULPA beyond the uniform act and into conflict with fraudulent transfer law" is patently undercut by explicit language yielding to DUFTA elsewhere in the Act. (Id.) Specifically, 6 DEL. CODE ANN. § 17-804, which governs the winding up of limited partnerships, expressly states that liability for limited partners receiving wrongful distributions could arise under "other applicable law." Del. C. § 17-804(c). As commentators have noted, this provision "recognizes that liability for a wrongful distribution could arise outside of the Act, including under the provisions of the Uniform Fraudulent Transfer Act." MARTIN I. LUBAROFF AND PAUL M. ALTMAN, LUBAROFF AND ALTMAN ON DELAWARE LIMITED PARTNERSHIPS § 8.4 (Supp. 2001).

Finally, Defendant offers no persuasive legal authority articulating a difference between DUFTA and PUFTA. As the Court will discuss below, the case Defendant cites for the proposition that Defendant's "freedom from transferee liability is more clearly articulated in Delaware jurisprudence than in Pennsylvania jurisprudence" in fact conflicts with a wealth of authority from both Delaware and Pennsylvania courts espousing a contrary position. (Def.'s Reply Supp. Mot. Summ. J. 17.) Compare Territory of United States Virgin Islands v. Goldman, Sachs & Co., 937 A.2d 760, 764 n.155 (Del. Ch. 2007) with In re Joshua Slocum, Ltd., 103 B.R. 610, 623 (Bankr. E.D. Pa. 1989), In re Fidelity Bond and Mortg. Co., 340 B.R. 266, 286-87 (Bankr. E.D. Pa. 2006), In re Color Tile, Inc., No. CIV.A.98-358, 2000 WL 152129, at *5 (D. Del. Feb. 9, 2000).

Further, a wide range of cases from other districts – including the District of Delaware – have found that no choice of law conflict exists where both states have adopted the same relevant portions of the UFTA.  See, e.g., In re Mervyn's Holdings, LLC, 426 B.R. 488, 496 (Bankr. D. Del. 2010) ("[Delaware, California, and Minnesota] have similarly adopted the UFTA, and therefore the result is the same regardless of the choice of law issue."); In re Halpert & Co., Inc., 254 B.R. 104, 123-24 (Bankr. D.N.J. 1999) ("Initially, the Court notes that since both New Jersey and Florida have adopted the same relevant language for the Uniform Fraudulent Transfer Act, and no conflict appears in the relevant case law, no choice of law analysis is required.") (citations omitted); Zahn v. Yucaipa Capital Fund, 218 B.R. 656, 666 (Bankr. D.R.I. 1998) ("[I]f there is no conflict between the two states' laws, then the Court need not engage in a choice-of-law analysis. The California and Rhode Island versions of the UFTA are for all practical purposes identical.").

In sum, Defendant has offered no legislative or judicial authority showing a true conflict between Pennsylvania and Delaware law with regard to the issues at hand.  Given the lack of conflict between the law of the two states, no choice of law analysis is required – the Court will apply the law of Pennsylvania.


## IV.    DEFENDANT'S EVIDENTIARY OBJECTIONS

Before proceeding to a discussion of the merits, the Court will consider Defendant's Motion to Strike the Declarations of Richard Schreiber (Pl.'s Mot. Summ. J., Ex. 1, Declaration of Richard R. Schreiber ("Schreiber Decl."); Pl.'s Resp. Opp'n Def.'s Mot. Summ. J., Ex. 1,

Supplemental Declaration of Richard R. Schreiber ("Supp. Schreiber Decl.").)[3]  Defendant

argues that the declarations are hearsay and that Plaintiff's submission of them in lieu of

deposing Schreiber was improper.

Federal Rule of Civil Procedure 56(c) permits a party to submit affidavits or declarations

in support of or opposition to a motion for summary judgment.  Such declarations "must be made

on personal knowledge, set out facts that would be admissible in evidence, and show that the

affiant or declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4); Burg

v. U.S. Dept. of Health and Human Servs., No. CIV.A.07-2992, 2010 WL 5136107, at *4 (E.D.

Pa. Dec. 15, 2010).  "Statements in affidavits made only on belief or on information and belief

may not be considered in support of or in opposition to summary judgment."  Mosley v. City of

Pittsburgh Pub. Sch. Dist., No. CIV.A.07-1560, 2009 WL 2948519, at *1 (W.D. Pa. Sept. 8,

2009).

The Court finds no merit to Defendant's challenge to the Schreiber declarations.  Nothing

in the Federal Rules of Civil Procedure requires Plaintiff to depose Mr. Schreiber.  Indeed, under

28 U.S.C. § 1746, unsworn declarations may substitute for an affidavit if the statement is

"subscribed in proper form as true under penalty of perjury."  FED. R. CIV. P. 56(c)(4) cmt. on

2010 amdts. (citing 28 U.S.C. § 1746).  In the disputed declarations, Mr. Schreiber details the

relationship between the former and remaining Defendant(s), the structure of the sale and transfer

of proceeds, the resulting tax liability, and the parties' knowledge (or lack thereof) of this

---

[3]  Plaintiff likewise moves to strike Exhibit 3 to the Supplemental Declaration of Richard Reinthaler.  For the sake of clarity, the Court will address Plaintiff's evidentiary objections in the context of its discussion of the consent judgment.

liability at the time of transfer.  He states that he has personal knowledge of such facts through

his position as vice president and member of the board of directors of RMH and as partner at

DS&P, through which he acted on behalf of RMH, the Fund, and DS&P with regard to the sale at

issue.  (Schreiber Decl. ¶ 1; Supp. Schreiber Decl. ¶ 1.)  Mr. Schreiber has asserted that, if called

upon to testify, his testimony would be consistent with the declarations at issue.  <u>Id.</u>  As such, the

Court finds that Mr. Schreiber's testimony complies with the personal knowledge and

competency prongs of Rule 56(c).  Moreover, the Court does not find – nor does Defendant

articulate – any reason that Mr. Schreiber's declarations, based solely upon his personal

knowledge, would qualify as hearsay.  Accordingly, the Court finds that the declarations comply

with 28 U.S.C. § 1746(2), such that the Court may rely upon them in determining whether any

material facts are in dispute.

The Court also declines to strike what Defendant deems "factual and legal

misrepresentations" in Plaintiff's Reply Memorandum in Support of its Motion for Summary

Judgment.  "[M]otions to strike are disfavored and usually will be denied 'unless the allegations

have no possible relation to the controversy and may cause prejudice to one of the parties, or if

the allegations confuse the issues in the case.'"  <u>Kim v. Baik</u>, No. CIV.A.06-3604, 2007 WL

674715, at *5 (D.N.J. Feb. 27, 2007) (quoting <u>River Road Dev. Corp. v. Carlson Corp.</u>, No.

CIV.A.89-7037, 1990 WL 69085, at *2 (E.D. Pa. May 23, 1990)).  While Defendant may

disagree with Plaintiff's legal arguments or characterization of the facts, the Court will resolve

such disputes through its review of the evidence and arguments set forth in the parties' briefings.

Accordingly, the Court denies Defendant's Motion to Strike in its entirety.

## V. DISCUSSION

The parties' Cross-motions for Summary Judgment raise a number of common issues. Thus, in order to avoid a duplicative discussion of the two Motions, the Court will address their commonly-raised issues in joint fashion, remaining cognizant of each party's individual burden of proof.

Plaintiff seeks to recover RMH's unpaid tax liability from Defendant pursuant to the Pennsylvania Uniform Fraudulent Transfer Act. PUFTA states, in relevant part:

> (a) General rule --A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> . . .
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 PA. CONS. STAT. § 5401.

Section 5108(b) of PUFTA offers protection to certain transferees, stating that, "to the extent a transfer is voidable," judgment may be entered only against:

> (1) the first transferee of the asset or the person for whose benefit the transfer was made;
> or
> (2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

12 PA. CONS. STAT. § 5108(b).

13

Plaintiff's Motion contends that, because the Fund and DS&P have consented to liability as fraudulent transferees, "the subsequent transfers to Dupont are void as fraudulent as well, unless Dupont establishes that it was a bona fide purchaser for value" pursuant to § 5108(b). (Pl.'s Mot. Summ. J. 9.) For its part, Defendant denies that the consent judgment precludes it from re-litigating the initial transfer and asserts that Plaintiff has failed to otherwise carry its burden of proof with respect to the initial transfer. Moreover, Defendant maintains that it is immune from liability as a good faith transferee who took for value. Finally, Defendant argues that, should the Court find Defendant liable for the tax judgment against RMH, Plaintiff's attempt to recover statutory tax penalties and interest from Defendant is improper. The Court will consider these issues in turn.

### A.    Whether the Consent Judgment Establishes that the Initial Transfer to the Fund was Fraudulent

A consent judgment "has the binding force of a legal determination on the parties thereto only." Sabatine v. Pennsylvania, 442 A.2d 210, 212 (Pa. 1981); see also Sullivan v. City of Pittsburgh, 811 F.2d 171, 181 (3d Cir. 1987) ("[U]nder Pennsylvania law, a consent decree is an agreement only between parties and does not bind or preclude the claims of non-parties."). Here, Defendant did not consent to the entry of the judgment. Therefore, with respect to the issue of the initial transfer, Defendant is not bound by the judgment's terms.

Plaintiff concedes that the judgment does not bind Defendant, but insists that it still precludes Defendant from litigating the initial transfer because it establishes, "if only by agreement," that the transfers to the Fund and DS&P were fraudulent. (Pl.'s Reply Supp. Mot.

14

Summ. J. 3-4.)[4]  The Court disagrees.  "[I]ssue preclusion attaches only '[w]hen an issue of fact

or law is actually litigated and determined by a valid and final judgment, and the determination is

essential to the judgment.'"  Arizona v. California, 530 U.S. 392, 414 (2000) (quoting

RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982)).  It is well established that, in the case of

judgments entered by consent, "none of the issues is actually litigated."  Id.; In re Olson, 170

B.R. 161, 167-68 (Bankr. D.N.D. 1994); see also 18 CHARLES WRIGHT ET AL., FEDERAL

PRACTICE & PROCEDURE § 4443, at 383 (1981) ("[T]he central characteristic of a consent

judgment is that the court has not actually resolved the substance of the issues presented.").

Rather, the judgment "merely reflects an agreement" by parties to conclude litigation.  Olson,

170 B.R. at 168; see also Holland v. New Jersey Dept. Of Corrs., 246 F.3d 267, 277 (3d. Cir.

2001) (stating that a consent judgment "is a hybrid of a contract and a court order," embodying

the agreement of the parties); Sabatine, 442 A.2d at 212 ("The parties' agreement that the

original conveyance was invalid had absolutely no legal weight in any other proceeding, other

than as proof that they did so agree and would therefore be bound as between themselves.").

Courts have noted that consent judgments may be motivated by any number of collateral

considerations, including the costs of litigation or an inconvenient forum.  United States v. Int'l

Bldg. Co., 345 U.S. 502, 505-06 (1953) ; In re Corey, 583 F.3d 1249, 1251 (10th Cir. 2009).

Thus, the Court should deem an issue "fully litigated" only if the language of the judgment

---

[4]  In its Motion, Plaintiff seeks judgment "based on the lack of any available defense to
Dupont for the transfers it received from the Fund."  (Pl.'s Mot. Summ. J. 3 n.1.)  Plaintiff
acknowledges that Defendant also received transfers from DS&P, but does not appear to litigate
these transfers at this stage of the proceedings.  Id.  Accordingly, for the purposes of this opinion,
the Court will consider only the transfers to and by the Fund.  The Court further notes that
Plaintiff has reserved all rights to arguments not made in its Motion.  Id.

manifests such an intent by the parties.  Arizona, 530 U.S. at 414; Int'l Bldg., 345 U.S. at 505-06

(stating that, where the language of judgment does not reveal whether it was based on the merits

or a collateral consideration, it "has no greater dignity, so far as collateral estoppel is concerned,

than any judgment entered only as a compromise of the parties"); In re Woodford, 418 B.R. 644,

651-52 (1st Cir. 2009); Olson, 170 B.R. at 167-68.

By way of illustration, in Olson, a debtor entered into a consent judgment stipulating to

uncontested federal income taxes and statutory additions for fraudulent under-reporting of

income.  170 B.R. at 163.  When the debtor sought to re-litigate the issue of fraud in a later non-

dischargeability proceeding in bankruptcy court, the court found that the consent judgment

established the validity of the tax deficiencies,[5] but did not admit to the existence of the

underlying fraud.  Id. at 168.  According to the court, although the Internal Revenue Code

authorized the imposition of the under-reporting penalty only "where fraud is established, the

issue of fraud was never litigated or admitted, nor was a specific factual finding concerning it

made."  Id.  Thus, because the judgment "merely reflect[ed] an agreement" by the parties, the

court found it did not preclude the debtor from litigating the issue of fraud in a later proceeding.

Id.

---

[5]  Notably, the bulk of Plaintiff's argument with respect to the consent judgment asserts
that consent judgments establishing tax liabilities "are binding as to third-parties against whom
collection of the judgment liability is sought."  (Pl.'s Reply Supp. Mot. Summ. J. 4-5 (citing
Baptiste v. Comm'r, 29 F.3d 1533, 1539 (11th Cir. 1994), U.S. v. Davenport, 484 F.3d 321, 327
(5th Cir. 2007)).)  As will be discussed below, this Court agrees that a consent judgment
determining the *existence* and *amount* of tax liability is a judgment on the merits and is thus
preclusive as to subsequent transferees.  That issue, however, is distinct from whether the
judgment precludes Defendant from challenging the fraud underlying the Fund's transferee
liability under PUFTA.  Accordingly, the Court will consider the issue of Defendant's right to re-
litigate the tax deficiencies separately in Section D.

Here, the relevant portion of the judgment states only that the Fund and DS&P are each "indebted to the United States for the full amount of RMH's unpaid income taxes and statutory additions to tax for 2002, as a transferee under 12 Pa. C.S.A. § 5101, et seq., in the amount of $3,237,969 as of July 21, 2008, plus statutory additions to tax according to law until fully paid." (Docket No. 44.)  As in Olson, the judgment neither admits to specific conduct underlying the Fund's transferee liability, nor makes specific factual findings as to the transfers in question. Therefore, while the judgment establishes the validity of the agreement concluding litigation between those parties and Plaintiff, it cannot be said to manifest an intent to preclude Defendant, a non-party to the judgment, from litigating the issue of fraud underlying the initial transfer to the Fund.[6]

The cases Plaintiff cites for the broader proposition that voluntary dismissals, where no litigation took place, have res judicata effect are inapposite.  In both Brooks v. Barbour Energy Corp., 804 F.2d 1144, 146 (10th Cir. 1986) and Clark v. Haas Group, Inc., 953 F.2d 1235, 1238 (10th Cir.), cert. denied, 506 U.S. 832 (1992), the same parties that consented to a voluntary dismissal later attempted to bring the same or a related claim in a subsequent suit.  Here,

_____

[6]  Plaintiff has moved to strike Exhibit 3 to the Supplemental Declaration of Richard Reinthaler, which Defendant offers to show that the other Defendants agreed to the consent judgment only to avoid further litigation.  "For the purposes of enforcement, a consent judgment is to be interpreted as a contract, to which the governing rules of contract interpretation apply. The court must discern the scope of a consent judgment by review of what is within the four corners of the consent, not by reference to what might satisfy the purposes of one of the parties to it."  Harley-Davidson, Inc. v. Morris, 19 F.3d 142, 148 (3d Cir. 1994) (quotations and citations omitted).  Given that the Court must make its determination irrespective of the mindset of the parties to the judgment, this evidence becomes irrelevant.  Accordingly, the Court need not address the merits of Plaintiff's Motion.

Defendant did not consent to the earlier judgment, nor is Defendant bringing a subsequent suit – rather, Defendant is arguing that it should not be precluded from litigating an essential element of Plaintiff's claim against it as the only non-consenting party remaining in the action. Chase Manhattan Bank, N.A. v. Celotex Corp., 56 F.3d 343 (2d Cir. 1995) is similarly unpersuasive. In that case, the court found res judicata inapplicable to a suit for property damage by a building owner against an asbestos manufacturer where the original owner of the building had already agreed to voluntary dismissal of an identical claim. Id. Finally, in In re Medomark Canning, 922 F.2d 895, 900 (1st Cir. 1990), the court found that a court-approved settlement between an estate and senior mortgagees had res judicata effect as to unsecured creditors who did not raise their equitable subordination arguments during the settlement process. The settlement agreement in Medomark, however, explicitly indicated the estate's intent to release all subordination claims against the mortgagees. Id. Moreover, the court found that the trustee of the estate properly acted on behalf of the estate's creditors (including the appellants) when entering the agreement, such that the agreement bound the appellants. Id. In contrast, no fiduciary or representative of Defendant consented to the judgment in the instant case, nor does the language of the judgment suggest an intent to preclude Defendant from fully litigating the claim still remaining against it. Accordingly, the Court finds that the judgment does not bar Defendant from litigating the alleged fraud underlying the initial transfer.

**B.      Whether the Initial Transfer to the Fund Was Constructively Fraudulent**

Having declined to accord conclusive weight to the consent judgment, the Court must now consider the merits of the parties' arguments with regard to whether the initial transfer was fraudulent. A transfer is "constructively fraudulent" under PUFTA where the debtor made the

18

transfer without receiving a "reasonably equivalent value in exchange for the transfer or obligation," and:

> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 PA. CONS. STAT. § 5104(a)(2).

The "unreasonably small assets" test set forth in subsection (a)(i) does not require insolvency, but rather an "inability to generate sufficient profits to sustain operations." In re Fidelity Bond and Mortg. Co., 340 B.R. 266, 294 (Bankr. E.D. Pa. 2006) (citing Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1070 (3d Cir.1992)); see also In re Joy Recovery Tech. Corp., 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002) ("[U]nreasonably small capital means something more than insolvency or inability to pay debts as they come due. Being left without adequate capital would mean that the transaction in issue put [the debtor] on the road to ruin."); MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 944 (S.D.N.Y. 1995) ("The test is aimed at transferees that leave the transferor technically solvent but doomed to fail."). Similar to the "reasonable foreseeability" test of subsection (a)(ii), the unreasonably small assets test "takes into account, among other things, the debtor's present and prospective debts, and whether the retained assets are sufficiently liquid to enable the debtor to pay such debts as they become due." 12 PA. CONS. STAT. § 5104 cmt. 4. Therefore, both tests "should be viewed as addressing slightly different aspects of the same fundamental inquiry: whether the debtor is and, on a continuing basis, will be able to pay its debts as they become due." Id.

The question of whether a debtor left itself with unreasonably small assets to carry on its business is ultimately one of foreseeability. Peltz v. Hatten, 279 B.R. 710, 744 (D. Del. 2002) (citing Moody, 971 F.2d at 1073 (holding that the test for "unreasonably small capital" is "reasonable foreseeability")). In evaluating whether a debtor reasonably should have known it would incur debts it could not pay, "[t]he debtor should not be responsible as a matter of hindsight for developments that could not reasonably have been foreseen at the time of the transfer." Id.; In re R.M.L., Inc., 92 F.3d 139, 155 (3d Cir. 1996) ("The use of hindsight to evaluate a debtor's financial condition for purposes of the Code's 'insolvency' element has been criticized by courts and commentators alike.") Thus, the Court's relevant inquiry under either subsection is whether RMH's belief that the sale would incur no tax liability was "reasonable and prudent at the time [the projection of potential liability] was made." 12 PA. CONS. STAT. § 5104 cmt. 4 (citing Credit Managers Assoc. of S. Cal. v. Fed. Co., 629 F. Supp. 175, 184 (C.D. Cal. 1985)).[7]

Defendant contends there is no evidence showing that RMH or the Fund knew of or reasonably should have anticipated the federal tax liability giving rise to post-distribution insolvency. (Def.'s Mot. Summ. J. 27.) According to Defendant, prior to the sale's closing,

---

[7] Notably, the parties also dispute whether, in violation of the first prong of § 5104(a)(2), RMH made the initial transfer to the Fund without receiving "a reasonably equivalent value in exchange for the transfer or obligation." Defendant argues, without elaboration, that RMH made the distribution in consideration of the Fund's investment in RMH. (Def.'s Reply Supp. Mot. Summ. J. 32.) Plaintiff frames the exchange slightly differently, arguing that RMH received the distributions as the owner and sole shareholder of RMH. (Pl.'s Mot. Summ. J. 5; Schreiber Dec. ¶ 12.) Whether holding a 100% shareholder interest in an entity created for the sole purpose of acquiring another corporation constitutes "reasonably equivalent value" is a question of law not sufficiently briefed by the parties. Absent such briefing, the Court declines to make a determination as to this issue at this time.

RMH, the Fund, and DS&P were advised by legal counsel at Reed Smith that any gain on the sale would be offset by net operating loss carryforwards, such that the transaction would incur no federal income taxes. (Id. Exs. 14; Ex. 17, Dep. of Lewis Tippets, 49:18-49:21, Apr. 19, 2010 ("Tippets Dep."); Ex. 26.) Indeed, Defendant claims that it was not until March of 2003 that RMH's accountant, Lewis Tippets, preliminarily determined a tax was due and alerted RMH as to the existence of potential liability. (Tippets Dep. 42:20-43:21; Ex. 27.) Via subsequent conversations with Tippets, DS&P learned that Reed Smith had mistakenly used RMH's outside basis of $11 million to calculate potential tax liability, as opposed it its inside tax basis of $1 million. (Id. Ex. 28.) According to Defendant, this information "evoked disbelief" from the Fund and DS&P. (Tippets Dep. 49:14-49:21 ("[T]here was disbelief that they owed income taxes . . . . They were questioning, highly questioning my calculation."); 48:25-49:2, 54:19-54:20, 65:22-66:12.) Defendant maintains that RMH, the Fund, and DS&P's reliance on mistaken advice from legal counsel with regard to the amount of tax liability the sale would incur was reasonable. (Def.'s Reply Supp. Mot. Summ. J. 35 (citing U.S. v. Boyle, 469 U.S. 241, 251 (1985) (stating that "when an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice" and not seek a second opinion)).)

With regard to the foreseeability of the tax liability, Defendant also argues that "it would be improper to ascribe insolvency to RMH based on a tax liability that did not exist and was not reasonably anticipated until the following year, many months after the Distributions." (Id. at 36.) Under Defendant's reading of the Internal Revenue Code, the tax liability did not accrue until at least six months after the transfer. (Def.'s Mot. Summ. J. 28 (citing U.S. v. Green, 201 F.3d 251,

257 (3d Cir. 2000) ("The United States is considered a creditor from the date when the obligation to pay income taxes accrues, essentially on April 15 of the year following the tax year in question.")).) Moreover, Defendant claims that the amount of liability was not finalized until at least August of 2003. (Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. 22; Tippets Dep. at 89:16-17.) Based on this six-month delay, Defendant contends that RMH was not left with "unreasonably small" assets after the transfer because RMH reasonably believed it needed no more than a minimal amount of funds to wind down its business operations. (Def.'s Mot. Summ. J. 25.

Conversely, Plaintiff argues that the initial transfer qualifies as fraudulent under both subsection (a)(i) and (a)(ii), as the transfer left RMH with insufficient assets to pay a foreseeable tax debt. (Pl.'s Mot. Summ. J. 21, Exs. 221, 249, 250; Tippets Dep. 50:9-13; 83:17-23.)[8] In support, Plaintiff offers evidence that RMH discussed the potential tax consequences of the sale both within the corporation and with legal counsel as early as six months before the sale's closing date. (Pl.'s Mot. Summ. J., Ex 283; Schreiber Decl. ¶ 10; Def.'s Mot. Summ. J., Ex 21.) Contrary to Defendant's claim, Plaintiff asserts that RMH's legal counsel did *not* suggest that no taxable gain would result from the sale. Rather, they simply "advised RMH of the methodology

---

[8]    The Court notes that Defendant, citing the same financial statements as Plaintiff, contends that the transfer did not leave RMH insolvent, "on paper, at least," because they show $15,429,539 in assets (consisting of cash and a receivable from the Fund), $2,471,393 in liabilities (including the federal tax liability in dispute), and $12,954,147 in stockholders' equity as of December 31, 2002. (Def.'s Mot. Summ. J. 25 n.12.) The Court finds these differing interpretations of RMH's financial state irrelevant to the issue at hand. First, as previously noted, PUFTA does not require insolvency. Second, although the parties dispute whether these statements suggest insolvency on the part of RMH, Defendant does not contest that RMH's transfer of its only remaining asset did ultimately leave the entity unable to pay its outstanding tax liability. (Id. at Stmnt. Facts ¶ 47.) Accordingly, as discussed above, the Court finds the more appropriate inquiry to be whether the tax liability was reasonably foreseeable by RMH at the time of the transfer.

for calculating the taxable gain, but stated they could not calculate it without up-to-date tax and financial information." (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. 32; Ex. 403, Dep. of Joseph Sedlack, 25:7-27:22, Apr. 27, 2010 ("Sedlack Dep.").)[9] Plaintiff maintains that RMH never provided such information nor asked its attorneys or accountant to perform the calculation, despite being advised to do so. (Sedlack Dep. 27:7-28:1; 31:11-32:5; 43:16-44; Tippets Dep. 83:24-84:17.) Thus, in Plaintiff's view, RMH should have reasonably anticipated that a taxable gain on the sale would arise, yet failed to calculate the amount of its tax liability as instructed by its legal counsel.

Whether a tax liability was reasonably foreseeable falls within the province of the trier of fact. In light of the conflicting evidence offered by both parties, the Court finds that a genuine issue of material fact remains as to whether RMH reasonably should have believed it would incur the liability in dispute. Accordingly, the Court declines to grant summary judgment as to this issue.

### C. Whether Defendant was a Good Faith Transferee who Took for Value

The parties' next dispute concerns whether Defendant is immune from judgment pursuant to the protections of PUFTA § 5108(b). Section 5108(b) states that judgment may be entered against "the first transferee of the asset or the person for whose benefit the transfer was made," or "any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee." 12 PA. CONS. STAT. § 5108(b). Defendant contends that, even if

---

[9] Defendant attacks Mr. Sedlack's testimony as "self-serving" and argues that it occurred too long after the transaction for the court to consider it as credible evidence of foreseeability. It is inappropriate at the summary judgment stage, however, for the Court to make credibility determinations of either party's testimony.

Plaintiff establishes that the initial transfers were fraudulent, Defendant is immune from judgment as a good faith transferee who took for value. Plaintiff concedes, for purposes of the Cross-motions for Summary Judgment, that Defendant took in good faith. (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. 19 n.3.) Plaintiff argues, however, that the Court may enter judgment against Defendant as "the person for whose benefit the transfer was made" pursuant to 5108(b)(1), or alternatively because Defendant did not take "for value" as required by 5108(b)(2).

1.      **Whether Defendant was the "Person for Whose Benefit the Transfer was Made"**

"A subsequent transferee cannot be an entity for whose benefit the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer." In re Bullion Reserve of N. Am., 922 F.2d 544, 547-48 (9th Cir. 1991); (citing Bonded Fin. Servs. v. European Am. Bank, 838 F.2d 890, 895 (7th Cir.1988)); In re Columbia Data Prods., Inc., 892 F.2d 26, 29 (4th Cir. 1989); see also In re Richmond Produce Co., 118 B.R. 753, 760 (Bankr. N.D. Cal. 1990) ("[A] subsequent transferee can never be an entity for whose benefit the initial transfer was made."). Indeed, courts have consistently held that the "entity for whose benefit the transfer was made" is distinct from a transferee, immediate or otherwise. See, e.g., Bonded, 838 F.2d at 895; In re Bullion, 922 F.2d at 547-48. Rather, the term encapsulates "a guarantor or debtor – someone who receives the benefit but not the money." Bonded, 838 F.2d at 895. Here, neither party disputes that Defendant received the sales proceeds in question. As such, Defendant cannot be the entity for whose benefit the transfer was made.

2.      **Whether Defendant Took "For Value"**

PUFTA states that value is given where "property is transferred or an antecedent debt is secured or satisfied." 12 PA. CONS. STAT. § 5103(a). Defendant does not claim that property has been transferred, but does contend that its $57 million capital contribution to the Fund created a debt that the Fund was contractually obligated to satisfy pursuant to the distribution provisions of the Limited Partnership Agreement ("LPA").[10]

PUFTA defines "debt" as "liability on a claim." 12 PA. CONS. STAT. § 5101(b). In turn, "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal equitable, secured or unsecured." Id. It is well-established that a limited partnership interest constitutes an equity security. Buncher Co. v. Official Comm. of Unsecured Creditors of

_____

[10] Section 5.4(a) of the LPA states:

> (a) [The Fund] shall distribute at the end of each Fiscal Quarter all Distributable Funds (i) first, to the Partners in proportion to their relative Capital Contributions, until the Limited Partners have received from amounts then and previously distributed, pursuant to this Section 5.4, the full amount of their Capital Contributions plus a 10% internal rate of return calculated as set forth in Section 5.1(a)(i) and (ii) thereafter, 80% to the Partners in proportion to their relative Capital Contributions and 20% to the General Partner.

(Def.'s Mot. Summ. J. Ex. 2.)

The LPA defines "Distributable Funds" as:

> [A]ll proceeds received by the Partnership . . . during any such period . . . as reduced by (i) all costs and expenses incurred during such period, including expenses incurred in any sale or disposition transaction, (ii) the discharge during such period of any indebtedness or liabilities of the Partnership for which such proceeds are to be used and (iii) the setting aside during such period of such reserves as the General Partner may deem reasonably necessary for the discharge of known or existing liabilities or obligations of the Partnership.

(Id. § 1.4.)

GenFarm Ltd. P'ship IV, 229 F.3d 245, 252 (3d Cir. 2000). In turn, courts within the Third Circuit have consistently held that equity interests are not "debt" within the meaning of PUFTA or the Bankruptcy Code's analogous fraudulent transfer provision. In re Joshua Slocum, Ltd., 103 B.R. 610, 623 (Bankr. E.D. Pa. 1989) (stating that stockholders' right to dividends is dependent on financial solvency of corporation, and is therefore not fixed liability or debt); In re Fidelity Bond and Mortg. Co., 340 B.R. 266, 286-87 (Bankr. E.D. Pa. 2006) (finding that issuance of dividends returned no value to debtor); In re Color Tile, Inc., No. CIV.A.98-358, 2000 WL 152129, at *5 (D. Del. Feb. 9, 2000) (finding that the purchase of preferred shares and resulting dividends were an equity interest, and thus that the dividend payments could not constitute satisfaction of an antecedent debt).[11]

It follows, then, that limited partnership distributions do not qualify as "antecedent debt" constituting an exchange "for value" for the purposes of PUFTA. It is widely held that true creditors "hold claims regardless of the performance of the partnership business," whereas payment of partnership distributions are "subject to [] profits or losses." In re Riverside-Linden Inv. Co., 925 F.2d 320, 323 (9th Cir. 1991). To hold that a limited partner interest constitutes a debt of the partnership would allow limited partners to receive distributions ahead of even secured creditors. Such a holding would be inconsistent with both the purpose of PUFTA (to

---

[11] Much of the Uniform Fraudulent Transfer Act derives from the Bankruptcy Code, such that findings made under the Code regarding constructive fraud are applicable to UFTA actions. Fidelity Bond and Mortg. Co. v. Brand, 371 B.R. 708, 719 (Bankr. E.D. Pa. 2007); In re Joy Recovery Tech. Corp. 257 B.R. 253, 268 (Bankr. N.D. Ill. 2001).

protect creditors[12]) and the meaning of "distributable funds" within the LPA at issue here (those funds not subject to "indebtedness or liabilities"). Consistent with this logic, several courts have held that distributions made on account of partnership interests do not give rise to a "right to payment" and are thus not "for value." See, e.g., In re Agric. Research & Tech. Grp., Inc., 916 F.2d 528 (9th Cir. 1990) (distributions to a limited partner "were not for value because [the partnership] made the distributions on account of the partnership interests and not on account of debt or property transferred to the partnership in exchange for the distribution); In re Thunderdome Houston Ltd. P'ship, No. CIV.A.98-4615, 2000 WL 889846 (Bankr. N.D. Ill. June 23, 2000).

Defendant attempts to undercut the aforementioned cases by arguing that, even if its investment in the partnership did not create debt, its contribution conferred "value" on the partnership via the risk it undertook by investing with the hope of a future economic benefit. The cases Defendant offers in support of this proposition, while numerous, fail to persuade the Court that equity investments confer value on a transferor. Several of Defendant's cases concern loan agreements giving transferees a contractual right to repayment – not, as is the case here, a conditional right to repayment based on an equity interest. See In re RML, 92 F.3d 139 (3d Cir. 1996) (finding that the opportunity to obtain economic value in the future may qualify as value in the context of a proposed loan); In re Unified Commercial Capital, Inc., 260 B.R. 343 (Bankr. W.D.N.Y. 2001) (finding value where an account agreement between transferor and transferee

---

[12] See 12 Pa. Cons. Stat. § 5101 cmt. 3 ("[T]he purpose of this chapter is primarily to protect unsecured creditors against transfers and obligations injurious to their rights."); In re R.M.L., Inc., 92 F.3d 139, 150 (3d Cir. 1996) ("[T]he question whether the debtor received reasonable value must be determined from the standpoint of the creditors.").

specifically stated that interest was to be paid based on transferee's temporary loan, *not* transferee's capital contribution); In re Carrozzella and Richardson, 286 B.R. 480, 483-84, 486 (Bankr. D. Conn. 2002) (finding value where contract between transferor and transferee guaranteed "dollar-for-dollar" repayment and annual return rate between 8 and 15% for transferee's deposit, which could be withdrawn at any time).

Likewise, although In re Schraiber, Bankr. No. 87-17144, 1992 WL 280801 (Bankr. N.D. Ill. Sept. 14, 1992), names a partnership contract among a list of instruments that conferred value on the transferor, the court goes on to distinguish between those transferees who received distributions on account of their status as note holders or guaranty recipients (thereby creating an obligation on the defendant's behalf to make payments), and those who did not. Id. at *13, 18-19.

Similarly, in Scholes v. Ames, 850 F. Supp. 707 (N.D. Ill. 1994), the court suggests, in dicta, that the concomitant risks of making capital contributions to a partnership could confer value. However, this was within the context of an illegitimate Ponzi scheme, where "courts have reasoned that because a Ponzi investor immediately obtains a claim for restitution against the debtor upon making the investment by virtue of the debtor's fraud, the claim constitutes a debt owed to the investor." Thunderdome, 2000 WL 889846, at *8; see also MARK A. MCDERMOTT, PONZI SCHEMES AND THE LAW OF FRAUDULENT AND PREFERENTIAL TRANSFERS, 72 Am. Bankr. L.J. 157, 165-66 (1998) (citing Scholes) ("[E]ach dollar which an investor receives as a return of his principal investment constitutes a reduction of his claim for restitution against the debtor, which, as the satisfaction of an antecedent debt of the debtor, constitutes value (or consideration) to the debtor."). No Ponzi scheme is at play here; as such, Defendant's investment cannot be

said to give any right to restitution constituting debt.  Therefore, <u>Scholes</u> and other Ponzi cases Defendant has cited are distinguishable from the one at hand.

Finally, the Court notes Defendant's repeated reference to <u>Territory of United States Virgin Islands v. Goldman, Sachs & Co.</u>, 937 A.2d 760, 764 n.155 (Del. Ch. 2007).  The case states, in footnoted dicta, "In my view, a stockholder who receives a dividend has already given equivalent value for future dividends as of the time she buys her shares."  <u>Id.</u>  The case did not, however, involve a UFTA claim, nor did the court cite legal support sufficient to encourage this Court to go against the aforementioned weight of contrary authority.

Based on careful examination of current UFTA jurisprudence and the policies underlying the statute, the Court finds that Defendant's capital contributions to the Fund, a limited partnership in which Defendant had an ownership interest, did not constitute an exchange of value sufficient to create an antecedent debt.  It follows that Defendant cannot, as a matter of law, assert a defense to judgment under 5108(b)(2).[13]

### D.    Whether Plaintiff is Entitled to Seek Statutory Penalties and Interest

As noted above, RMH has consented to judgment against it for unpaid income taxes and statutory additions in the amount of $3,237,969 as of July 21, 2008, plus statutory additions to tax according to law until fully paid.  (Docket No. 44.)  The order further states that "interest shall accrue on this judgment pursuant to 28 U.S.C. § 1961(c)."  (<u>Id.</u>)  Plaintiff now seeks to collect from Defendant the full amount of the tax judgment (totaling $3,625,633.54 as of June

---

[13]  Plaintiff also asserts that the Court should view the transfers as one transaction such that Defendant may not unfairly take advantage of PUFTA's additional protections for subsequent transferees.  (Pl.'s Reply Supp. Mot. Summ. J. 26.)  In light of the Court's ruling that such protections do not apply to Defendant, the Court need not address this issue.

30, 2010) plus statutory penalties and interest. Defendant argues that it should not be liable for the statutory additions and interest because (1) such penalties and interest actually constitute punitive damages and pre-judgment interest, which are not permitted under PUFTA; (2) even if federal law, not PUFTA, dictated the imposition of penalties and interest, Plaintiff has failed to meet the Internal Revenue Code's requirements for imposing tax penalties and interest against RMH; and (3) even if such remedies are appropriate, equity requires the Court to make downward adjustments to Dupont's liability.

With respect to Defendant's first argument, the Court finds that, regardless of how Defendant characterizes the penalties and interest Plaintiff requests, nothing in the text or legislative history of PUFTA indicates that Plaintiff is barred from seeking such remedies. Section 5107(a)(1) states that a creditor may avoid a fraudulent transfer "to the extent necessary to satisfy the creditor's claims." Indeed, PUFTA's only apparent limitation on such claims is that they be restricted "to the value of the asset transferred, subject to adjustment as the equities may require." Id. § 5108(c); see also De West Realty Corp. v. IRS, 418 F. Supp. 1274, 1279 (S.D.N.Y. 1976) (interpreting identical fraudulent transfer statute as limiting "judgment against any transferee to whom [a] debtor has transferred the property up to the value of the property, but not exceeding the amount of the creditor's claim"); LeBeau v. Comm'r, 63 T.C.M. (CCH) 3177, at *1 (1992) ("The amount of the transferee's liability is limited to the lesser amount of the transferor's liabilities or the amount transferred to the transferee, plus any allowable interest.") (citing Yagoda v. Commissioner, 39 T.C. 170, 185 (1962), aff'd 331 F.2d 485 (2d Cir. 1964)).

Defendant reads § 5107(a)(1) as limiting its total liability to $1.8 million – the amount or "value" RMH would have held back in order to pay its original tax liability. (Def.'s Mot. Summ.

30

J. 34.)  To hold otherwise, Defendant argues, would contravene the statute's compensatory purpose by leaving Defendant in a worse position than had it never received the sale proceeds. The Court disagrees, finding that the "value of the asset transferred" was not, as Defendant contends, the amount of proceeds transferred by mistake, but rather the value of the sales proceeds transferred to Defendant.  See 12 PA. CONS. STAT. § 5108 cmt. 2 ("The value of the asset transferred is limited to the value of the levyable interest of the transferor, exclusive of any interest encumbered by a valid lien.").  While the Court has not engaged in any formal valuation process at this point in the proceedings, a cursory review does not suggest that Plaintiff's claim against Defendant for $3,625,633.54 plus penalties and interest would leave it in a "worse position" than had it never received roughly $15 million in sales proceeds (or alternatively, the nearly $13.5 million Defendant received from the Fund alone).  (Def.'s Mot. Summ J., Stmnt. Facts ¶ 36; Pl.'s Mot. Summ. J. Exs. 202, 203.)

Moreover, it is well-settled that federal law – not state law – determines statutory additions and pre-judgment interest on unpaid federal tax liabilities where, as here, the value of the asset exceeds the total judgment sought.  As one court explained, "[i]n cases where the transferred assets exceed the total liability of the transferor, the interest charged is upon the deficiency, and is therefore a right created by the Internal Revenue Code."  Upchurch v. Comm'r, 100 T.C.M. (CCH) 85, at *7 (2010) (quoting Estate of Stein v. Comm'r, 37 T.C. 945, 961 (1962)).  In contrast, where "the transferred assets are insufficient to pay the transferor's total liability, interest is not assessed against the deficiencies because the transferee's liability for such deficiencies is limited to the amount actually transferred to him."  Id.  Consequently, in the case of insufficient assets, "[i]nterest may be charged against the transferee only for the use of the

transferred assets, and since this involves the extent of transferee liability, it is determined by State law." Id. Courts have also extended this reasoning to statutory additions. See, e.g., Lowy v. Comm'r, 35 T.C. 393, 396 (1960) ("Petitioner argues, and quite correctly, that the existence and extent of transferee liability should be determined by State law. But the quantum of the underlying claim that the creditor is seeking to enforce against the transferee must be determined by the law which created that claim, which in this case is the Internal Revenue Code . . . ."); Borg v. Comm'r, 54 T.C.M. (CCH) 1243 (1987) (noting, where value of transferred assets exceed transferor's liability, "[w]hen a tax is not paid the United States becomes entitled, by Federal statute, not only to the taxes and additions but also for interest" from the date the tax was due); Butler v. Comm'r, 84 T.C.M. (CCH) 681, at *7 (2002) (finding transferees liable for tax liability plus statutory penalties and interest because the transferred assets exceeded the value of the total judgment, and thus were determined pursuant to federal law). Here, the value of the assets transferred exceeds the total judgment sought. Accordingly, Plaintiff may seek interest and penalties as determined by the applicable provisions of the Internal Revenue Code.

As to Defendant's second argument, the Court finds that Defendant is precluded from re-litigating the amount of RMH's tax liability. While Defendant is correct to argue that "[g]enerally, a transferee may challenge the underlying tax liability of the transferor," this right may be extinguished if res judicata applies. Jeffries v. Comm'r., 100 T.C.M. (CCH) 97, at *7 (2010) (citing U.S. v. Williams, 514 U.S. 527, 539 (1995)); Baptiste v. Comm'r, 29 F.3d 1533, 1539 (11th Cir. 1994). Courts may apply res judicata where: "(1) the issue contested in both proceedings [is] identical; (2) the parties to the subsequent proceeding are the same as, or are in

privity with, the parties to the earlier proceeding; and (3) the earlier proceeding resulted in a final judgment on the merits." <u>Nevada v. United States</u>, 463 U.S. 110, 129-30 (1983).

Defendant contends that it should not be bound by the amount stipulated in the Consent Judgment because Defendant was not a party to the judgment, nor was the judgment on the merits. It is well-established, however, that for purposes of tax liability, "a transferee is privy to a transferor and precluded from reopening a decision establishing the tax liability of his transferor." <u>Krueger v. Comm'r</u>, 48 T.C. 824, 829 (1967); <u>Baptiste</u>, 29 F.3d at 1539; <u>First Nat'l Bank v. Comm'r</u>, 112 F.2d 260, 262 (7th Cir. 1940); <u>Morris v. Comm'r</u>, 80 TCM (CCH) 886, at *3 (2000). Moreover, a consent agreement determining tax liability "is a judgment on the merits for the purposes of res judicata . . . ." <u>Baptiste</u>, 29 F.3d at 1539 (quoting <u>U.S. v. International Bldg.</u>, 345 U.S. 502, 506 (1953)). Courts have applied this rule with equal force to subsequent transferees. <u>Pert v. Comm'r</u>, 105 T.C. 370, 377 (1995). Thus, the consent judgment is a final decision on the merits for the purposes of RMH's tax liability, and precludes the Defendant from re-litigating this amount.

As to Defendant's final argument, whether equity or public policy requires downward adjustments of Plaintiff's recovery is an issue premature for discussion at this stage of the

proceedings, where Defendant's liability has yet to be established.[14]  Accordingly, the Court will not consider the issue at this time.

## VI.    CONCLUSION

In light of the foregoing, the parties' Cross-motions for Summary Judgment are denied. The Court finds that the previous consent judgment between Plaintiff, the Fund, and DS&P does not conclusively establish that the initial transfer was fraudulent for the purposes of Plaintiff's action against Defendant as subsequent transferee.  Moreover, the parties have raised a genuine issue of material fact as to whether RMH reasonably should have anticipated the tax liability on the sale.  With respect to subsequent proceedings, the Court finds that Defendant is barred from raising a good faith transferee defense under PUFTA § 5108(b), as Defendant's limited partnership contributions did not, as a matter of law, give value to the Fund in exchange for the transfer in question.  Finally, while the Court finds that Defendant is precluded from re-litigating the existence and amount of RMH's tax liability, the Court defers any further discussion of remedies until Defendant's liability is determined.

An appropriate Order follows.

---

[14]  In the course of arguing that Defendant is entitled to equitable adjustments, Defendant states, in a footnote, that the statute of limitations for bringing an action under PUFTA may be fatal to Plaintiff's claim.  (Def.'s Mot. Summ. J. n.20.)  Defendant's string citations suggest little more than disagreement among various courts as to whether state statutes of limitations apply to state fraudulent transfer actions brought by the United States.  Absent further briefing, the Court will not determine this issue at this stage of the proceedings.  See Gorum v. Sessions, 561 F.3d 179, 185 n.4 (3d Cir. 2009) ("'[A] passing reference to an issue . . . will not suffice to bring that issue before this court.'") (quoting Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp., 26 F.3d 375, 398 (3d Cir. 1994)).