## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,  :   CIVIL ACTION

          Plaintiff,  :

        v.  :   NO. 08-03381

ROCKY MOUNTAIN HOLDINGS, INC.,  :
DIMELING, SCHREIBER & PARK, L.P.,  :
DIMELING, SCHREIBER & PARK
REORGANIZATION FUND, L.P.,  :

        and  :

DUPONT CONOCO PRIVATE MARKET  :
GROUP TRUST,  :

        Defendants.  :

FILED

OCT 14 2011

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

## MEMORANDUM

BUCKWALTER, S. J.                                      October 17, 2011

### I.    FINDINGS OF FACT

1.    Plaintiff United States of America filed a Complaint for Federal Taxes on July 18, 2008 seeking to: (1) reduce a tax assessment against Rocky Mountain Holdings, Inc. ("RMH" or the "Taxpayer") to judgment; and (2) set aside allegedly fraudulent transfers from RMH to its sole shareholder, the Dimeling, Schreiber & Park Reorganization Fund, L.P. (the "Fund"), and from the Fund to its partners, Dimeling, Schreiber & Park, L.P. ("DS&P") and DuPont Conoco Private Market Group Trust ("DuPont"). (Docket No. 1.) On September 2, 2008, Plaintiff filed an Amended Complaint, which is indistinguishable in all material respects from the original Complaint and which is now the operative complaint. (Docket No. 2.)

2.      Defendants RMH, DS&P and the Fund, all of which had no assets and were judgment-proof, consented to entry of judgment against them and were dismissed from the case on March 25, 2010. (Docket No. 44.)

3.      On March 10, 2011, the Court denied the cross-motions for summary judgment, based on the existence of a triable issue of material fact. (Docket No. 60 (the "Opinion").) The Court determined that DuPont's liability as an alleged subsequent transferee depends on whether the initial transfers from RMH to the Fund were constructively fraudulent. This, in turn, depends on the triable issue of whether RMH reasonably should have anticipated its tax liability. (*Id.* at 34.) The opinion also left open the issue of "whether equity or public policy requires downward adjustments of Plaintiff's recovery" in the event DuPont is found liable as a subsequent fraudulent transferee. (*Id.* at 33-34.)

4.      A bench trial was held on May 23 and 24, 2011.

5.      Plaintiff United States of America maintains this action on behalf of the Internal Revenue Service, seeking to recover from DuPont, as a subsequent recipient of an alleged constructively fraudulent transfer, federal income taxes, together with interest and penalties, allegedly owed by RMH for the 2002 tax year.

6.      DuPont is a tax-exempt pension trust that manages pension fund assets for the benefit of rank-and-file DuPont employees and their families – from "the scientists to the factory workers to everyone in the U.S. who participates in the pension plan." *See* Unofficial Transcript of Trial ("Trial Tr.") (4) 40:6 – 11 (Lissner). As a fiduciary to these employees, DuPont must make every effort to manage their funds prudently. *See id.* at (4) 47:12 – 16 (Lissner) ("from a

2

fiduciary standpoint, it was, again – I mean, this is pensioners' assets. We were just trying to protect them . . . ."),

7.     DuPont was formed in 1999 in connection with E.I. Du Pont de Nemours & Co.'s divestiture of Conoco Inc. *See* Trial Tr. (4) 39:13 – 40:11 (Lissner). While the liquid pension assets were split between the DuPont Pension Trust and the Conoco Pension Trust, the illiquid private market assets (such as the investment in the Fund) are held at DuPont for the benefit of the two constituent pension trusts. *See id.* DuPont is a liquidating trust – as it accumulates cash from its investments, it makes periodic, aggregate cash distributions to the DuPont Pension Trust and the Conoco Pension Trust according to their pro rata shares (approximately 95 percent and 5 percent, respectively) of the existing private market assets. *See id.* at (4) 39:13 – 40:11 (Lissner).

8.     DuPont typically invests in partnerships as a passive limited partner because:

> to own a privately owned company requires so much time and attention and involvement in the management that it's difficult to invest enough money into these investments to really do it in a way that makes sense for the staffing levels of a pension fund. So it's pretty standard for institutional investors to hire outside parties, the general partners of these private equity firms to do so, to manage these investments on their behalf. And that was how it had been done throughout.

Trial Tr. (4) 39:4 – 12 (Lissner). As set forth below, this is precisely how DuPont's investment in the Fund was handled.

9.     On March 11, 1994, DuPont and DS&P entered into a Limited Partnership Agreement (the "LPA") to create the Fund. *See* Plaintiff's Ex. 1 (LPA). The principal purpose of the Fund was to "invest in and dispose of . . . indirectly through the formation of wholly-owned subsidiaries of the Partnership, certain assets of sound operating companies or entities which are recapitalizing, refinancing, reorganizing or making other major changes in the capital

structure . . . , whether in a proceeding brought under [the Bankruptcy Code], or otherwise . . . ." *Id.* at Section 1.2.

10.     Richard Schreiber ("Schreiber") was a founding principal of Dimeling Schreiber and Park, LP (DSP) in 1982, and has worked there continuously. (Trial Tr. Pt. I, 38:6-22.) He graduated from the University of Pennsylvania Wharton School of Business with a Bachelor of Science degree in Economics. (Trial Tr. 39:23 - 40:4.)

11.     DSP's business was and is to find and purchase "good companies with a bad balance sheet," own them, recapitalize them, and "harvest" them by selling them for a profit.

12.     DS&P was both the general partner and a limited partner of the Fund. In its capacity as the general partner, it held a 1 percent interest in the Fund. *See* Plaintiff's Ex. 38 (Rocky Mountain Organizational Chart). In its capacity as a limited partner, it held a 10.01 percent interest in the Fund. *Id.* DuPont held the remaining 88.99 percent interest as a limited partner. *See id.* DuPont was not – and has never been – a partner of DS&P. Trial Tr. (2) 35:7 – 11 (R. Schreiber).

13.     The Fund was required to be, and in practice was, managed exclusively by DS&P. Under Section 7.1 of the LPA, the general partner of the Fund (DS&P) had "the sole and exclusive right to manage, control and conduct the business of the [Fund] and to do any and all acts on behalf of the [Fund]," with certain limited exceptions. Plaintiff's Ex. 1 (LPA) at 16-17; *see also* Trial Tr. (2) 37:15 – 18 (R. Schreiber) ("Q. Under the limited partnership agreement, DS&P was solely responsible for the day-to-day oversight and management of [the investment in Rocky Mountain Holdings, Inc.], correct? A. Of the Fund's investment, yes."). By contrast, Section 8.2 of the LPA (entitled "No Control by the Limited Partners") provided that limited

4

partners such as DuPont "shall take no part in the control or management of the business or affairs of the [Fund] nor shall the Limited Partners have any authority to act for or on behalf of the [Fund] except as is specifically permitted by this Agreement." Plaintiff's Ex. 1 (LPA) at 21.

14.    DS&P prepared the Fund's financial reports, which DuPont reviewed and accepted "at face value." It neither sought supporting information nor conducted any independent analyses. *See* Trial Tr. (4) 51:25 – 52:11 (Lissner). DuPont was not consulted about and did not request information concerning the portfolio companies, including what funds would be held back to cover taxes or other liabilities when the companies were sold. *See id.* at (4) 42:11 – 43:10 (Lissner); (4) 64:5 – 10, 68:9 – 69:2 (Gigliotti).

15.    DSP used the Fund to purchase companies. The Fund and/or DSP would run the purchased portfolio companies for a number of years, be the owner, Schreiber and others would serve on the companies' boards, work with the management teams to improve operations and look to sell the company five to seven years later. (Trial Tr. Pt. I, 45:7-12.) Schreiber was personally involved in all phases of this process. (Id. Pt. I, 45:13-15.)

16.    One such company acquired by the Fund, and for which Schreiber was a corporate officer and member of the board of directors, was Rocky Mountain Holdings, Inc. (RMH). (Trial Tr. Pt. I, 42:18 - 43; 47:1-16-49:3; Pt. II, 16:13-23.) The Fund owned 100% of RMH. (U.S. Ex. 38.) The Fund, in turn, was run by DSP. (Trial Tr. Pt. I, 49:19-25.) DuPont owned 88.99% of the Fund. (U.S. Exs. 1, 37; Trial Tr. Pt. I, 50:1-8.)

17.    RMH, which had no employees and conducted no business, was a pure holding company. (Trial Tr. Pt. I, 52:13-18.) Its sole asset was a 50% ownership interest in Rocky Mountain Holdings, LLC (RMH LLC). (U.S. Ex. 38, Trial Tr. Pt. I, 52:19-53:1.) RMH was

interposed between the Fund and Helicopter as a "blocker" corporation to protect DuPont from

UBTI (unrelated business taxable income):

> [The Fund formed RMH] because of the – the structure of how the money
> went into the bankruptcy Court and into the ownership, half of it,
> approximately, went in as straight common equity and half of it went in as
> a subordinated loan. And the interest on the subordinated loan was going
> to cause a problem for . . . the DuPont Pension Fund, and it would be
> called . . . UBTI . . . .

Trial Tr. (1) 49:1 – 15 (R. Schreiber); *see also* Plaintiff's Ex. 8 (E-mail from Lori Lasher to

Joseph Sedlack, dated May 20, 2002); Trial Tr. (2) 37:24 – 38:7 (R. Schreiber). For its own tax

reasons, American Manufacturing Corporation, Inc. ("AMC"), the other 50 percent acquirer of

Helicopter, insisted on holding the operating company in a flow-through limited liability

company. Accordingly, on January 6, 1995, RMH and AMC created Rocky Mountain Holdings,

LLC ("RMH LLC") for the purpose of holding Helicopter. *See* Plaintiff's Ex. 3 (RMH LLC

Limited Liability Company Agreement, dated January 25, 1996) at Section 1.2; DuPont's Ex. 31

(Letter from Lori Lasher to John Collins, dated September 21, 2005) at 1.

18.   Schreiber signed the limited partnership agreement for the Fund (U.S. Ex. 1, Trial

tr. 50:12 - 51:10), the Articles of Incorporation for RMH (Ex. 2; Trial Tr. Pt. I, 51:11 - 52: 9),

and the limited liability company agreement for RMH LLC (U.S. Ex. 3; Trial Tr. Pt. I, 54:1-16).

19.   As Vice-President of RMH, Schreiber signed the Letter of Intent for the sale of

RMH's only asset, its fifty percent interest in RMH LLC. (U.S. Ex. 4; Trial Tr. Pt. I, 55:13-11.)

20.   Schreiber signed the Asset Purchase Agreement, whereby RMH sold its fifty

percent interest in RMH LLC. (U.S. Ex. 17; Trial Tr. Pt. II, 15:7 - 16:18.) The "Sellers" in the

transaction were RMH, AMC Helicopters, Inc. (the other 50% owner of RMH LLC) and RMH

LLC. (U.S. Exs. 17, 38; Trial Tr. Pt. III, 4:4:19 - 5:7.)

21.    Schreiber was the person primarily responsible for making the decisions for RMH at the time of the sale of its 50% interest in RMH LLC, which is why he was the person to whom correspondence was sent regarding the sale. (Trial Tr. Pt. I, 64:1 - 65:9.)

22.    DSP was solely responsible for overseeing and managing RMH, including its tax liabilities. (Trial Tr. Pt. II, 37:15 - 38:3.)

23.    No one, other than Schreiber, made any decisions about the conduct of the sale of RMH's 50% interest in RMH LLC other than Schreiber. (Trial Tr. Pt. II, 14:3-6, 129:1-7.)

24.    On April 4, 2002, RMH and AMC entered into a Letter of Intent to sell Helicopter to Air Methods Corp. ("Air Methods") (the "Sale"). Plaintiff's Ex. 4 (Letter of Intent, dated April 4, 2002); *see also* Trial Tr. (1) 55:13 – 22 (R. Schreiber).

25.    The Sale was originally conceived as a sale of assets, but was reformulated as a sale of RMH's and AMC's membership interests in RMH LLC – in part for tax reasons, including the avoidance of UBTI for DuPont. *See* Plaintiff's Ex. 5 (E-mail from Lori Lasher to Robert Strouse, et al., dated April 25, 2002); Plaintiff's Ex. 8 (E-mail from Lori Lasher to Joseph Sedlack, dated May 20, 2002); Trial Tr. (1) 57:8 – 19 (R. Schreiber).

26.    On June 6, 2002, RMH, AMC and Air Methods executed a Membership Interest Purchase Agreement effectuating the Sale at a purchase price of $28,000,000, subject to post-closing adjustments. *See* Plaintiff's Ex. 17 (Membership Interest Purchase Agreement, dated June 6, 2002).

27.    The Sale closed on October 16, 2002. As a result of the sale, RMH received $15,157,403.45 in net cash proceeds, representing 50 percent of the adjusted purchase price. *See*

DuPont's Ex. 30 (Letter from Lori Lasher to Carmen Gigliotti and Holly Lissner, dated June 24, 2005) at 6. RMH distributed nearly all of the Sale proceeds to the Fund.

28. The first 27 findings, *supra*, serve as background for the triable issue of whether RMH reasonably should have anticipated its tax liability. The following findings of fact are relevant to that issue.

29. RMH, the Fund and DS&P retained the law firm of Reed Smith to act as their counsel in connection with the negotiation, drafting and consummation of the Sale. Trial Tr. (2) 40:19 – 24 (R. Schreiber); (4) 4:19 – 5:18, (4) 6:23 – 7:9 (Lasher).

30. Reed Smith performed a substantial amount of work on the deal. The firm billed over a quarter of a million dollars for its work on this transaction in 2002 alone. *See* DuPont's Ex. 6 (Reed Smith Invoices, dated March 19, 2002 though January 17, 2003); *see also* Trial Tr. (2) 42:19 – 43:1 (R. Schreiber).

31. A part of Reed Smith's representation was providing advice on a variety of tax issues relating to the transaction. Trial Tr. (2) 43:2 – 6 (R. Schreiber). DS&P relied heavily on Reed Smith to handle tax matters because no one at DS&P, including Richard Schreiber, Peter Schreiber and Malcolm Ratson, was a tax accountant or tax expert. *Id.* at (2) 44:13 – 22 (R. Schreiber); *see also id.* at (2) 45:19 – 23 (R. Schreiber).

32. Before the Sale closed and any proceeds could be distributed, DS&P – as the general partner of the Fund – needed to consider whether the Sale would generate any federal income tax liability for RMH. *See* Trial Tr. (2) 43:7 – 44:3 (R. Schreiber); *see also id.* at (2) 45:2 – 6 (R. Schreiber). DS&P looked to Reed Smith for advice on this key issue. *See* Trial Tr. (2) 45:24 – 46:2 (R. Schreiber) ("Q. So in order to make sure that you were fulfilling your

duties and doing the right thing, you consulted with Reed Smith and asked for its advice on this important issue, right?  A.  With the entire transaction; that was a piece of it, yes.");
(2) 49:16 – 20 (R. Schreiber) ("There is no . . . way I would've been able to do the calculation myself.").

33.     Reed Smith was focused on this issue early in the Sale process. Lori Lasher, an experienced corporate partner at Reed Smith who was in charge of the Sale, *see* Trial Tr. (2) 4:2 – 10, (2) 41:18 – 25, (2) 42:1 – 4, (1) 80:2 – 6 (R. Schreiber); (3) 130:20 – 25 (Lasher), specifically identified the issue of whether income taxes would be due on the Sale and whether a portion of the proceeds would need to be withheld to cover such taxes. Trial Tr. (2) 46:3 – 5 (R. Schreiber); *see also id.* at (4) 7:25 – 8:3 (Lasher).  In an e-mail to Richard Schreiber dated May 20, 2002, she wrote:

> When you have a minute, we need to set up a call with you (and whoever will be doing the Fund I/Rocky Holdings) returns to discuss implications and where possible, structure (through allocation of purchase price or otherwise) *to minimize any adverse tax consequences.* Joe [Sedlack] is at 215-851-8132 if you want to chat with him directly at your convenience or Paul or I could set something up. Just let us know. Thanks.

Plaintiff's Ex. 8 (E-mail from Lori Lasher to Joseph Sedlack, dated May 20, 2002) (emphasis added); *see also* Trial Tr. (2) 47:13 – 20 (R. Schreiber).  Lasher flagged this issue "to make sure that [DS&P] had taken into account taxes [on the Sale]," *id.* at (3) 137:19 – 24 (Lasher), and because she believed it was an important enough issue for her to suggest that Schreiber discuss it with one of her tax partners. *Id.* at (4) 8:14 – 20 (Lasher).

34.     Within minutes, Schreiber responded that "I will call shortly.  The main issue here is that Dupont pension fund, as the 90% partner should be tax exempt." Plaintiff's Ex. 8 (E-mail from Lori Lasher to Joseph Sedlack, dated May 20, 2002).  Schreiber wanted to make sure that

Lasher knew DuPont was a tax exempt entity that should not have to pay any tax as a result of the Sale. Trial Tr. (2) 47:21 – 48:8 (R. Schreiber).

35.     Lasher then forwarded these two e-mails to one of her tax partners at Reed Smith, Joseph Sedlack, specifically asking him the following question: "Will [RMH] need to pay taxes on its own on the gain, before it distributes to [the Fund]?" Plaintiff's Ex. 8 (E-mail from Lori Lasher to Joseph Sedlack, dated May 20, 2002). Lasher explained that she forwarded this e-mail chain to Sedlack to "make sure he had the proper information for when he was talking to Rick [Schreiber]." Trial Tr. (3) 140:22 – 141:3, (4) 10:16 – 24 (Lasher).

36.     Lasher flagged the same issue again in another e-mail to Sedlack and another Reed Smith lawyer working on the Sale, Paul Jaskot, the very next day:

> One other thing to remind rick of related to taxes…they will have to pay taxes on earnings from 12/31 to closing for LLC earnings, allocated to the inc., in addition to any cap gains taxes. They need to hold enough back to cover that and expenses or other payments under the agt. Might help if a list was prepared summarizing what [t]hese are likely to be, paul can do stuff in agt and perhaps you or mike might take a stab on taxes… Tks for your help on this.

Plaintiff's Ex. 9 (E-mail from L. Lasher to J. Sedlack and P. Jaskot, dated May 21, 2002). Lasher sent this e-mail because, as the attorney in charge of the deal, she believed it was important for these issues to be raised and discussed with Schreiber. Trial Tr. (4) 11:19 – 25 (Lasher); *see also* *id.* at (3) 141:14 – 23 (Lasher) (Lasher was "making sure that [the tax issue] was part of the conversation [with Schreiber].").

37.     The person responsible for deciding what to do with the Sale proceeds, testified repeatedly that RMH and DS&P had been advised by Reed Smith that no tax would be due, and that he never would have authorized the distribution of the entire Sale proceeds absent such

advice. He explained that "[w]e were told, well, the fact is there's not tax due anyway because of this tax law, this carry-forward." Trial Tr. (2) 48:17 – 49:14 (R. Schreiber); *see also id.* at (1) 65:17 – 66:3 (R. Schreiber) ("We viewed [the Sale] as a successful exit sale that we were going to get back more than we put into the deal, and – but we also had been informed that it would not result in a taxable event, that there would be no tax due because of there would be operating loss carry forwards from . . . the period in which we owned it."); (1) 70:24 – 71:1 (R. Schreiber) ("[W]hen we heard that there was no tax due, we accepted and, frankly, it sounded about right, too."); (1) 71:4 – 9 (R. Schreiber) ("I don't recall if I was personally told it or if it came back through one of our employees . . . . But, yes, certainly, we heard that there was not a tax due."); (1) 71:20 – 21 (R. Schreiber) ("[Reed Smith said t]hat there was not going to be a tax due because there was a tax loss carry forward . . . ."); (2) 26:12 – 23 (R. Schreiber) ("Q. [H]ow did you know there were [operating loss carry-forwards from during the period of ownership]? A. Because somebody at Reed Smith said there was, based on looking at the tax returns."); (2) 34:6 – 11 (R. Schreiber) ("Q. Sitting here today, do you know, specifically, what advice from Reed Smith you relied upon? A. We were told there was not a tax due because there was a carry-forward.").

38.    Schreiber was *certain* that Reed Smith gave this advice:

Q.    [Y]ou are quite certain, as certain as you can be eight and a half years after the event, that you actually sought and did obtain legal advice from Reed Smith on this issue.

A.    Yes.

Q.    All right. And to the best of your knowledge, did DS&P provide Reed Smith with the information it requested in order to provide advice on this issue?

A.    Yes.

Q.    You did not withhold anything from them that was available at the time?

A.    I can't imagine that we – yes, we gave them what they asked for.

11

Trial Tr. (2) 50:12 – 51:9 (R. Schreiber).

39.     The testimony also established that DS&P and its principals had nothing to gain

by distributing the Sale proceeds prematurely or erroneously:

| | |
|---|---|
| Q. | Did you have any financial incentive to pay the entire proceeds out? |
| A. | No. |
| Q. | Okay, your compensation was not dependent on doing so? |
| A. | Not by one penny. |
| Q. | You received no bonus for doing so? |
| A. | No. |
| Q. | You had no personal motive; you had nothing to gain by paying everything out? |
| A. | Correct. |

Trial Tr. (2) 45:9 – 18 (R. Schreiber). Malcolm Ratson testified to the same effect. *See id.* at (2)

97:14 – 98:2 (Ratson). Richard Schreiber emphasized that all they were trying to do was "the

right thing." *Id.* at (2) 75:20 – 76:6 (R. Schreiber) ("I just want to make that point to everybody.

We tried to do the right thing here. . . . Not a penny of it went to us, and – . . . there was no

incentive for us to do anything but the right thing."); (2) 25:14 – 16 (R. Schreiber) ("We were

just trying to do the best job for our partners. And you know, we had no reason not to give

[DuPont] the money. We did not think there was a tax.").

40.     Both Richard Schreiber and Malcolm Ratson emphasized that, had they been

advised that a tax would be due on the Sale, they would not have distributed the entire Sale

proceeds. *See* Trial Tr. (2) 25:16 – 20 (R. Schreiber) ("We did withhold a little bit to pay the

accountants and the final legal bill, but we could – if we'd known there was a tax, we could have

easily held it back, but we were just trying to the right thing for everybody, here."); (2)

96:22 – 24 (Ratson) ("Q. Would you have distributed the entire sale proceeds if you knew or

believed that a tax was payable? A. No."). Indeed, Schreiber testified that even if Reed Smith

had advised that it was unable to render any opinion on whether taxes would be due, DS&P

would not have distributed the entire proceeds without seeking a more definitive second opinion.

*Id.* at (2) 51:23 – 52:4 (R. Schreiber).

41.     Lori Lasher, who had previously flagged the issue of a possible holdback for taxes

for Rick Schreiber and Joseph Sedlack to discuss, acknowledged at trial that Reed Smith

provided advice to the sellers regarding the tax consequences of the Sale. Trial Tr. (3)

135:23 – 136:17 (Lasher). She claimed, however, that she did not know what that advice was,

*see id.* at (4) 13:5 – 7 (Lasher), yet she allowed the Sale to close knowing that no taxes were

being withheld:

> Q.     You attended the closing, did you not?
>
> A.     I did.
>
> Q.     And you knew, did you not, that Rocky Mountain Holdings intended to and did, in fact, distribute all of the proceeds it received at the closing to its one hundred percent shareholder, the fund?
>
> A.     I was pretty sure that almost all those monies are going out that way. But I mean, I didn't have details of wires or – et cetera.
>
> Q.     All right. You knew that nothing was being withheld from the distributions to pay for or as a reserve for taxes, correct?
>
> A.     I believe that's correct. I mean I didn't go over the details of whether the money was going.

*Id.* at (4) 16:23 – 17:11 (Lasher).

42.     Mr. Schreiber's testimony regarding the advice he received from Reed

Smith is further buttressed by Reed Smith's conduct following the discovery in early

2003 that a mistake had been made and that a tax would, in fact, be due. Reed Smith

(and Lasher in particular) were made aware, as early as April 2003, of Richard

Schreiber's understanding and belief that he had been advised by Reed Smith that no tax

would be due on the Sale proceeds, yet Reed Smith never did anything to dispute or

correct him.  For example, in an e-mail to Lori Lasher dated April 16, 2003, Richard

Schreiber, after exclaiming that he can "scarcely understand what happened to lead to the

current conclusions" that a tax was due, asked Lasher how "we can think through

returning to whatever the purchase agreement was previously that led to the earlier

conclusion that there was no tax due."  DuPont's Ex. 25 (e-mail from Rick Schreiber to

Peter Schreiber and Malcolm Ratson, dated April 16, 2003).  Lasher did not take issue,

orally or in writing, with this statement.  Trial Tr. (4) 25:4-25; 26:1-6.

43.     Likewise, in a letter to DuPont dated December 16, 2003 – which Lori

Lasher "probably" helped draft (*See* Trial Tr. (4) 27:5 – 13 (Lasher); *see also id.* at (2)

64:15 – 19 (R. Schreiber) ("some of these paragraphs would have come from [Reed

Smith]"), and certainly received – Richard Schreiber explained that "[t]he Fund and

[RMH] were advised prior to the sale that there would be no tax liability on the gain from

the sale of its interest in Helicopter due to the accumulated tax loss carry forwards

generated during the time of [RMH's] investment."  DuPont's Ex. 29 (Letter from

Richard Schreiber to Carmen Gigliotti and Holly Lissner, dated December 16, 2003) at 2.

44.     On December 21, 2006, Phillip Pillar, a former Reed Smith tax partner

who had replaced Lasher as the Reed Smith partner responsible for dealing with DuPont

and the IRS, wrote to IRS Revenue Officer Kathy Settimi that "RMH was advised prior to

the sale that there would be no tax liability on the gain from the sale of its interest in

Helicopter due to the accumulated tax loss carry forwards generated during the time of

RMH's investment."  DuPont's Ex. 33 (Letter from Phillip Pillar to IRS, dated December

21, 2006) at 2.

The following findings are related to the role of Joseph Sedlack:

45.    Schreiber was not made aware of potential tax liability by U.S. Exhibit 5. That exhibit, moreover, demonstrates the complexity of the transaction in this case and the need for professional advice at each step.

46.    As set forth in Finding of Fact 33, Schreiber was made aware of possible tax consequences on May 20, 2002. (U.S. Exhibit 8). Specifically, the email said:

> Rick, I know that AMC has their own tax advisors/analysis on structure and implications for the cash sale, but we haven't had a chance to review those issues on the DS&P/Fund I side. When you have a minute, we need to set up a call with you (and whoever will be doing the Fund I/Rocky Holdings) returns to discuss implications and where possible, structure (through allocation of purchase price or otherwise) to minimize any adverse tax consequences. Joe is at 215-851-8132 if you want to chat with him directly at your convenience or Paul or I could set something up. Just let us know. Thanks.

47.    DSP's business was and is to find and purchase "good companies with a bad balance sheet," own them, recapitalize them, and "harvest" them by selling them for a profit. (Trial Tr. Pt. I, 40:22 - 43:20.)

48.    Sedlack provides legal services to clients concerning corporate income taxes. (Trial Tr. Pt. III, 8:6-9). At some point, he performed legal services in this matter on behalf of Reed Smith's client, Rocky Mountain Holdings, LLC. (Trial Tr. Pt. III, 9:15-24. His role was to review the tax sections of the Membership Interest Purchase Agreement of Sale. (Trial Tr. Pt. III, 14:5-13).

49.    The aforementioned agreement placed the responsibility of filing all tax returns on Reed Smith client, above, and Sedlack testified that "we had been asked by them how this would go about determining their tax liability." (Trial Tr. Pt. III, 20:19-25).

50.     Sedlack insisted that he only provided methodology but could do no more because of lack of current tax basis information. (Trial Tr. Pt. III, 27:12 to 29:8).

51.     Sedlack was not asked why he needed tax returns to explain the methodology, if he was not being asked to actually estimate the tax liability.

52.     More importantly, Sedlack never offered a satisfactory reason as to why he did not comply with Lasher's request in Plaintiff's Ex. 9, which said:

> One other thing to remind rick of related to taxes...they will have to pay taxes on earnings from 12/31 to closing for the LLC earnings, allocated to the inc., in addition to any cap gains taxes. They need to hold enough back to cover that and expenses or other payments under the agt. Might help if a list was prepared summarizing what these are likely to be, paul can do stuff in agt and perhaps you or mike might take a stab on taxes... Tks for your help on this.

53.     Sedlack's testimony tends to support Schreiber's testimony that he had been advised by Reed Smith that no tax would be due, because it focuses on the fact that this was a very important issue being discussed by Reed Smith counsel.  While Sedlack himself may never had told Schreiber no tax was due, somebody from Reed Smith conveyed that message so that at the time of settlement, no money was held back for taxes.

54.     Post settlement, in an e-mail to Malcolm Ratson dated March 14, 2003, Lewis Tippets recounted a conversation he just had with Joseph Sedlack, in which Sedlack acknowledged that he had mistakenly "added the NOL, $7 million, to the basis, $11 million and figured that if the sales price was under $18 million, there would be no income taxes due." DuPont's Ex. 22 (E-mail from Lewis Tippets to Malcolm Ratson, dated March 14, 2003).  Plaintiff did not ask Sedlack any questions about this e-mail at trial.  Sedlack did not remember speaking to Tippets in March, 2003.  (Trial Tr. Pt. III,

16

115:14-17). Sedlack also testified in his deposition that he did not remember talking to Tippets prior to closing but at trial, remembered that he did. (Trial Tr. Pt. III, 96:13-25, 97:1).

## II.   LAW

Both parties agree that the legal issue is: (1) whether the tax liability was reasonably foreseeable; and (2) that reliance on advice of counsel is a recognized basis for making a determination in that regard. Thus, the case boils down to whether RMH reasonably relied on the advice of counsel.

## III.   CONCLUSION

Based on the findings of fact, defendant has proven by clear and convincing evidence that RMH reasonably relied on the advice of counsel.

Findings of Fact 29, 30, 31, 32, 33, 34, 35 and 36 demonstrate the substantial role of professional counsel throughout this entire transaction, and 37 and 38 conclusively find that Reed Smith gave the advice that no tax was due.

Moreover, Findings of Fact 39 and 40 further support the advice of counsel defense. DS&P and its principals had nothing to gain from erroneously distributing the sale proceeds. Furthermore, if indeed Reed Smith had advised that it was unable to render an opinion on whether taxes would have been due, DS&P would not have distributed the proceeds without getting a second opinion.

Conduct following the sale as set forth in Findings 42, 43 and 44 support the conclusion that RMH relied on the advice of counsel with regard to no tax liability.

It is important to the advice of counsel defense, as plaintiff correctly points out, that the client fully discloses all material facts to counsel. "Sandbagging" by client or disingenuousness in supplying information to counsel will defeat the advice of counsel defense.

In this case, the court has found as a fact that DS&P did not withhold anything from counsel and gave them what they asked for (Finding of Fact 38).

In fact, there is no evidence to support anything to the contrary, although plaintiff argues that Sedlack's testimony evidencing lack of cooperation on the part of RMH suggests that RMH was less than forthcoming in this regard.

In my own view, Sedlack's testimony supports the complex nature of the transaction and the need for an expert to advise the taxpayer precisely on his or her tax liability, if any. Here, that is what happened. The taxpayer was advised that there was no tax liability. Although Sedlack claimed to have trouble getting certain information, it is not at all clear that he asked or attempted to ask the person who could provide it.

Much time has passed since the events of this transaction, and nothing in writing was offered in evidence by which Reed Smith at or before the closing advised RMH one way or the other. But other evidence suggests that such advice was given, besides Schreiber's testimony. *See* Findings of Fact 41, 42, 43, 44 and 54.

An order follows.